IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY PATE, | CASE NO. 1:20-CV-01778-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION |
| Defendant. | |

## INTRODUCTION

Plaintiff Kimberly Pate filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 12, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Pate filed for DIB on February 15, 2018, alleging a disability onset date of December 31, 2014. (Tr. 63-64). Her claims were denied initially and on reconsideration. (Tr. 63-86). She

1

then requested a hearing before an Administrative Law Judge. (Tr. 100-01). Ms. Pate (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 14, 2019. (Tr. 35-62). On September 4, 2019, the ALJ issued a writing decision finding Ms. Pate not disabled. (Tr. 12-30). The Appeals Council denied Ms. Pate's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see also* 20 C.F.R. §§ 404.955, 404.981). Ms. Pate timely filed this action on August 12, 2020. (ECF #1).

## FACTUAL BACKGROUND

### I. ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Pate and VE George Coleman, III, presented during the hearing before the ALJ.

Ms. Pate testified she was 54 years old and has a high school education. (Tr. 38). She has worked as a part-time receptionist in salons and as a technician for a vehicle inspection service. (Tr. 38, 51). Ms. Pate also attempted to work as a nanny in 2017, but could not continue because the work required her to lift, bend, and squat to take care of the children. (Tr. 45).

Ms. Pate testified her neck pain started on or around December 31, 2014; she was unsure of the reason for the onset of her pain. (Tr. 38-39). She began treatment with her doctor and received monthly injections to manage her pain. (*Id.*). Ms. Pate also experienced arm numbness and limitations in her activities. (Tr. 39). Imaging showed degeneration of the spine and spinal stenosis. (*Id.*). Ms. Pate was eventually diagnosed with Rheumatoid Arthritis ("RA"). (*Id.*).

Ms. Pate describes her mornings as waking up, having a cup of coffee, watching the news, and stretching to "try to unstiffen [her] body." (Tr. 39-40). She then completes small chores, such as folding the laundry, calling her mother, or washing the dishes. (Tr. 40-41). Due to pain, she is

unable to complete her chores fully without breaks. (*Id.*). She can work for 15 or 20 minutes before needing to rest and use a heating pad or ice to relieve the pain and inflammation. (Tr. 49). She does not shower until her husband returns from work in case she falls. (Tr. 41). She uses a shower seat. (*Id.*). Ms. Pate is able to drive short distances but must stop and walk around when driving longer distances due to pain. (Tr. 43). Ms. Pate testified she could lift less than ten pounds without pain. (Tr. 47-48).

Ms. Pate testified that as a receptionist, she worked for up to six-hour shifts, three days per week. (Tr. 50-52). She had to lift up to five pounds in that position, restocking large bottles of shampoo and conditioner. (*Id.*). She was not always able to lift and carry the products and would need to ask someone else to carry them. (Tr. 52).

Ms. Pate treats with ibuprofen, tramadol, and tizanidine (a muscle relaxant). (Tr. 42). Her joints swell occasionally. (Tr. 42-43). Ms. Pate had a seven-day trial for a spinal cord stimulator, which provided some relief. (Tr. 46). However, she was unable to have it permanently implanted due to the arthritis in her spine. (Tr. 50). Ms. Pate rated her pain during the hearing at a seven out of ten. (Tr. 44). While in the hearing, Ms. Pate had to stand to relieve her pain. (Tr. 43).

The VE then testified. Ms. Pate has a number of part-time and temporary jobs in the record, dating back to 2005. (Tr. 53-57). However, the ALJ only asked the VE to classify Ms. Pate's work at the salon as a receptionist and at E-check as a Vehicle Technician. (Tr. 57). The VE classified the Receptionist position as DOT[1] #237.367-010, SVP[2] 3, semiskilled, sedentary as

---

[1]       "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d).

[2]       "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility

classified and as performed. (*Id.*). He classified the Vehicle Technician or Tester position as DOT #620.261-014, SVP 7, skilled, light as classified and as performed. (Tr. 57-58). The VE testified that this position's skillset is job-specific, and few skills would transfer readily to a sedentary position. (Tr. 58).

The ALJ presented the first hypothetical to the VE: An individual of the same age, education, and work background as Ms. Pate, who can lift/carry twenty pounds occasionally and ten pounds frequently; she can stand/walk six out of eight hours per day; no limitations on push/pull or foot pedals; can frequently use a ramp or stairs, but never use a ladder, rope, or scaffold; can constantly balance, stoop, kneel, and crouch, but only occasionally crawl; constant bilateral reaching, handling, fingering, and feeling; must avoid dangerous machinery and unprotected heights; but with no visual or communications deficits. (Tr. 58-59). The VE responded that such an individual would be able to perform both the Receptionist and Vehicle Tester DOT positions. (Tr. 59).

The VE also identified other positions in the national economy this hypothetical individual could perform:

- Office Helper/Clerical Assistant (DOT #239.567-010): SVP 2, unskilled, light, 83,250 jobs available in the national economy;

- Mailroom Clerk (DOT #209.687-026): SVP 2, unskilled, light, 24,770 jobs available in the national economy; and

- Order Caller (DOT #209.667-014): SVP 2, unskilled, light, 52,560 jobs available in the national economy.

(Tr. 59-60).

---

needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

The ALJ posed a second hypothetical to the VE, limiting the individual to lifting/carrying twenty pounds occasionally, ten pounds frequently; walking and standing four out of eight hours, sitting six out of eight hours, and requiring a sit/stand option every half-hour for two minutes but with no loss of productivity. (Tr. 60). The VE first testified that the individual could not perform any past work, but could perform the jobs previously identified. (*Id.*). The VE confirmed there would be no reduction in the number of jobs in the national economy identified. (*Id.*).

On cross-examination by Ms. Pate's counsel, the VE clarified that the past work as a receptionist would still be available. (*Id.*). The VE also confirmed that work would be precluded if the employee was off-task 20% of the time. (Tr. 61). Similarly, more than two absences per month would exceed the standard for absenteeism. (*Id.*). Based on the VE's experience, employers only permit up to one day per month absent in unskilled competitive work opportunities. (*Id.*). Ms. Pate's counsel then posed a hypothetical limiting the individual to two hours sitting, two hours standing, and two hours walking, and lifting ten pounds. (*Id.*). The VE responded that such postural limitations would preclude all competitive work, as they did not add up to a competitive eight-hour day, and that the ten-pound limit was more consistent with a sedentary position. (*Id.*).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Pate was 49 years old at the time of her alleged onset date, and 54 years old at the time of the administrative hearing. (Tr. 28, 38). Ms. Pate completed twelfth grade and has a high school education. (*Id.*). In the past, Ms. Pate has been employed as a receptionist at a salon and a vehicle inspection technician. (Tr. 27-28).

Ms. Pate worked as a receptionist at a salon from 2011 through 2015. (Tr. 175). She stated she worked three to four days per week, six to seven hours per day. (Tr. 50-51, 177). In that period, Ms. Pate had the following earnings:[3]

| Year | Employer | Annual Earnings |
|------|----------|-----------------|
| 2011 | Shear Elegance | $689.28 |
| 2012 | Shear Elegance | $5,952.83 |
| 2013 | Shear Elegance | $5,562.00 |
| 2013 | Sun Dance Day Spa | $120.00 |
| 2014 | Sun Dance Day Spa | $6,012.50 |
| 2014 | Illusions Unlimited | $7,343.02 |

(Tr. 158-59). Ms. Pate also reported income of $914.74 in 2015, $1,498.00 in 2016, and no income in 2017, 2018, or 2019. (Tr. 159).

### III.  RELEVANT MEDICAL EVIDENCE

Ms. Pate received treatment for her back and neck pain from Jonathan Salewski, D.O. (*See, e.g.*, Tr. 245-87). Ms. Pate treated her back and neck pain with regular appointments for osteopathic manipulation of her cervical spine and medications to relieve her pain and headaches. (Tr. 245, 248, 251-52, 254, 260, 263, 272, 275-76, 278, 286-87). She also received periodic nerve block injections. (Tr. 245, 251, 275-76, 278, 286).

---

[3]     The Commissioner observes that Ms. Pate's stated annual FICA earnings, showing earnings as high as $17,043.76 in 2012. (Comm'r's Br., ECF #17, PageID 696-97; *see also* Tr. 160). I note, however, those annual amounts are aggregated from all jobs Ms. Pate performed in those years, not just the receptionist position. (*Compare* Tr. 158-159 *with* Tr. 160). As such, I summarize only the income Ms. Pate has identified as derived from her work as a receptionist. (*See* Pl.'s Br., ECF #15, PageID 678).

During visits in August and October 2014, Ms. Pate complained of having three years of intractable headaches and neck pain. (Tr. 266, 269). Dr. Salewski found Ms. Pate had cervical facet arthrosis and cervical spinal canal stenosis causing radiculopathy. (Tr. 269). Dr. Salewski renewed her medications and recommended water aerobics and soft tissue massage. (Tr. 269-70).

In October 2014, Ms. Pate rated her pain at a four on a ten-point scale. (Tr. 266). Ms. Pate exhibited paraspinal tenderness in her upper cervical region along with the suboccipital groove. (*Id.*). Her deep tendon reflexes were normal. (*Id.*). Dr. Salewski prescribed her tramadol for the pain and Zomig for her migraines, and recommended physical therapy. (*Id.*).

Dr. Salewski's clinical notes from February 18, 2015 indicate that Ms. Pate "has severe decreased range of motion in flexion, extension, and rotation" as a result of her muscle contractions and severe neck pain. (Tr. 254). Ms. Pate rated her pain at a seven on a ten-point scale. (*Id.*). Ms. Pate treated with Tramadol and received osteopathic manipulation at this visit, which she tolerated well. (*Id.*).

On June 25, 2015, Ms. Pate had an osteopathic manipulation of the cervical spine and trigger point injections of C3 and C4 facet joints on the right. (Tr. 245). Notes indicate Ms. Pate rated her pain at a seven on a ten-point scale, but she had responded well to the injections in the past. (*Id.*).

On November 10, 2016, Ms. Pate was treated by George Saridakis, D.O., for her acute lumbar back pain. (Tr. 243). Dr. Saridakis found mild dextroscoliosis of the thoracolumbar junction and levoscoliosis of the lower lumbar spine. (*Id.*). He also found moderate to severe multilevel degenerative disc disease with endplate sclerosis and osteophytosis, greatest at L1-L3 and

L4-L5. (*Id.*). According to Dr. Saridakis's notes, the findings had progressed since the prior exam. (*Id.*). There was evidence of degenerative change in the sacroiliac joints. (*Id.*).

Ms. Pate began treating with Kutaiba Tabbaa, M.D., in July 2017. (*See* Tr. 315-20). Dr. Tabbaa reviewed Ms. Pate's prior history, including MRIs dating back to November 2010, demonstrating Ms. Pate's disc disease and disc space narrowing. (Tr. 317-20). Dr. Tabbaa assessed Ms. Pate with lumbosacral degenerative disc disease, cervical spondylosis with myelopathy, and osteoarthritis of the lumbosacral spine. (Tr. 317).

Notes indicate Ms. Pate was compliant with her home exercise program and presented good effort in therapy. (Tr. 312). Ms. Pate's responses to the Oswestry Back Pain Questionnaire were 28/50, indicating "severe disability." (Tr. 314). She was able to walk independently but had a mildly antalgic gait. (*Id.*). She had difficulty with prolonged sitting, standing, walking, lifting, bending, squatting, and performing yardwork and housework. (*Id.*).

Dr. Tabbaa's treatment notes from September 29, 2017 indicate Ms. Pate rated her pain at eight on a ten-point scale; she could stand, sit, and walk for ten minutes at a time. (Tr. 305-06). She reported her pain ranges between five and ten on a ten-point scale. (*Id.*). A lumbar medial branch block at L2-L5 performed on August 17, 2017 provided four days pain-free, but her pain became a five out of ten by the fourth day. (Tr. 306). Dr. Tabbaa provided a right trochanteric bursae injection, which Ms. Pate tolerated well and provided "excellent resolution of symptoms." (Tr. 309). Goals included increasing the flexibility of her hip flexors, quads, and piriformis to allow full hip motion with only minimal pulling, and increasing the strength of her hip musculature to at least 4/5 to allow for proper body mechanics during functional activities. (Tr. 305, 314-15).

Ms. Pate treated with Dr. Tabbaa on October 5, 2017. (Tr. 304). Ms. Pate indicated that she manages her pain with tramadol and Aleve, and rated her pain at a four or five on a ten-point scale. (*Id.*). Ms. Pate was assessed as experiencing relief with manual therapy and stretching exercises. (Tr. 304-05). At an October 19, 2017 visit, she reported her pain at ten on a ten-point scale. (Tr. 303). Dr. Tabbaa administered a bilateral lumbar medial branch block at L3, L4, and L5 that Ms. Pate tolerated well. (Tr. 303-04).

Ms. Pate reported her symptoms began worsening in late 2017 and early 2018. (Tr. 293, 295-96, 298, 304). A January 25, 2018 treatment note from Dr. Tabbaa indicated Ms. Pate had "[p]rogressive lumbar claudication with severe DDD [degenerative disc disease] and DJD [degenerative joint disease] of L3-5." (Tr. 302). Dr. Tabbaa also indicated Ms. Pate may need fusion for stability. (*Id.*). Dr. Tabbaa again administered a bilateral lumbar medial branch block at L3, L4, and L5 that Ms. Pate tolerated well. (*Id.*).

On February 26, 2018, Ms. Pate reported her pain was at a ten on a ten-point scale, and she could only sit, stand, or walk for five minutes at a time. (Tr. 295). A lumbar medial branch block on January 25, 2018, provided 50% pain relief (to a 5/10) for one week; relief from prior medial branch blocks had lasted for a month each. (*Id.*). Ms. Pate had an abnormal gait and decreased forward flexion/extension and lateral flexion. (Tr. 297). Her reflexes were normal. (*Id.*).

On May 4, 2018, Ms. Pate had a follow-up visit with Timothy O'Brien, M.D., after receiving an abnormal spine MRI on April 10. (Tr. 291-94). The MRI of her lumbarspine showed possible lymphoma or metastasis, but a later bone marrow biopsy and blood tests were negative for malignancy. (*Id.*).

9

On September 8, 2018, Ms. Pate had a consultative examination with Bilal Mahmood, M.D. (Tr. 385-93). Ms. Pate reported that her pain intensity was a nine out of ten on examination. (Tr. 385). She had a steady and symmetric gait and did not need an assistive device. (Tr. 388). Her reflexes were normal and symmetric. (*Id.*). Her sensory examination was normal to light touch; her straight leg test was negative bilaterally, both sitting and supine. (*Id.*). Ms. Pate had tenderness in her right knee and lower back. (*Id.*). She could lift, carry, and handle light objects, and fine and gross manipulation was normal. (*Id.*). Ms. Pate was able to rise from sitting and walk on heels and toes with ease. (*Id.*). Ms. Pate could stand but did not attempt to hop on one foot due to knee pain. (*Id.*).

Dr. Mahmood noted Ms. Pate's diagnoses of pain in her low back, bilateral knees, and neck; however, he found no limitations in her ability to perform simple tasks, carrying, or lifting. (Tr. 389). He found no limitations with sitting, standing, or walking, and no significant limitations with lifting or carrying weight. (*Id.*). He recommended no limitations on bending, stooping, crouching, squatting, reaching, grasping, handling, fingering, and feeling. (*Id.*). He found no relevant visual, communicative, or workplace environmental limitations were necessary. (*Id.*). Dr. Mahmood completed manual muscle testing and found nearly all abilities were normal (*see* Tr. 390-93) except for flexion of the lumbar spine at 80 degrees (90 degrees indicates normal). (Tr. 392).

On September 26, 2018, Ms. Pate saw Dr. Saridakis for a sore throat. (Tr. 559-63). At the visit, Dr. Saridakis also evaluated Ms. Pate for low back pain and strain. (Tr. 562). He indicated a positive straight leg test at 45 degrees. (*Id.*). He found good range of motion and no tenderness in her hips. (*Id.*). However, she had restriction of motion in the cervical spine at C5, C6, and C7,

thoracic tenderness at T1 through T6, and palpable paraspinal muscle spasm at L3, L4, and L5. (*Id.*). Dr. Saridakis also observed diminished grip strength in the upper extremities with degenerative joint disease of the wrists and hands. (*Id.*). Ms. Pate had abnormal reflexes and sensation. (Tr. 561). Dr. Saridakis observed Ms. Pate had an antalgic gait due to chronic back trouble. (*Id.*).

A November 6, 2018 pain management clinic visit indicated multilevel degenerative changes in the lumbar spine at T10-T11, L1-L5, and L5-S1, including disc bulges, narrowing of disc space, facet hypertrophy, and thickening of ligamentum flavum. (Tr. 396-97). Ms. Pate's back was tender to palpations over cervical and lumbar spine, but strength was normal. (Tr. 398). Notes indicate Ms. Pate was stable on the current regimen; her prescriptions for tramadol, ibuprofen, and tizanidine were refilled. (Tr. 399-401).

Dr. Tabbaa noted Ms. Pate has a significant history of chronic pain syndrome with intractable pain in her lower back and legs. (Tr. 459). Ms. Pate, in consultation with Dr. Tabbaa, elected to proceed with a trial of a spinal cord stimulator after having failed multiple physical therapy sessions, interventional therapies, and medical management, none of which relieved her symptoms. (Tr. 459). Dr. Tabbaa attempted insertion of a spinal cord stimulator on January 28, 2019. (Tr. 417-70). Insertion was difficult and failed at the T11-T12 level, but eventually completed at the left T12-L1 level, with leads staggered at T8 and T9. (Tr. 458-59). On follow up on January 31, 2019, Dr. Tabbaa noted a 20-30% improvement in Ms. Pate's pain, although her back was likely in pain due to the difficult insertion attempts. (Tr. 472). X-rays showed good midline placement in the posterior epidural space at T8 and T9. (*Id.*). By the February 4, 2019 follow-up visit, Ms. Pate was reporting greater than 50% improvement in pain despite the difficult

insertion and shotgun technique used. (Tr. 475-76). A request for a total implant was ordered. (Tr. 476).

At an April 22, 2019 appointment with Dr. Saridakis, Ms. Pate exhibited a waddling gait and restricted range of motion in her cervical and lumbar spine. (Tr. 557). Dr. Saridakis found she had osteoarthritis in her fingers, and degenerative joint disease in her shoulders and knees, with poor coordination and abnormal reflexes and sensation. (Id.). Otherwise, her stability and muscle strength and tone were normal. (Id.). Dr. Saridakis prescribed Ms. Pate with duloxetine for her chronic back pain. (Tr. 557-58).

On May 13, 2019, Dr. Tabbaa attempted to insert a spinal cord stimulator permanently. (Tr. 486-532). After multiple failed attempts to insert the lead, Dr. Tabbaa aborted the case. (Tr. 486-87, 521). Dr. Tabbaa's findings reflect that Ms. Pate's severe degenerative joint disease with osteophytes "made it impossible to access epidural space safely and place leads in proper area." (Tr. 521).

On May 28, 2019, Florin Penciu, M.D., Ms. Pate's family doctor, completed a medical source statement. (Tr. 480-82). Dr. Penciu based his statement on four years of treating Ms. Pate for her RA, degenerative disc disease and multilevel polyarthralgia. (Tr. 480). Dr. Penciu described Ms. Pate's reduced range of motion and small joint changes due to her RA. (Id.). Dr. Penciu indicated Ms. Pate would be absent more than four days per month as a result of her impairments. (Id.). Dr. Penciu indicated Ms. Pate could only walk one-half of a city block before needing to rest, could only sit for fifteen minutes at one time, and could only stand for ten minutes before needing to change positions. (Tr. 480-81). In total, Ms. Pate could only sit and stand/walk for less than two hours, and would need a job that permitted the shifting of positions at will. (Tr. 481). Ms. Pate

12

would sometimes need unscheduled breaks during the work day (after more than 5 hours) and would need to rest for an hour before returning to work. (Tr. 481). According to Dr. Penciu, Ms. Pate could rarely lift and carry ten pounds, and rarely twist, stoop, crouch/squat, or climb ladders or stairs. (Tr. 481). Dr. Penciu opined Ms. Pate has significant limitations with reaching, handling, or fingering. (Tr. 481). Dr. Penciu indicated Ms. Pate's limitations had manifested themselves in some degree for seven years, but had become severe in the six months prior to his report. (Tr. 482).

On May 31, 2019, Ms. Pate visited with Sean Nagel, M.D., on referral from Dr. Tabbaa for a possible implantation of a spinal cord stimulator with paddle lead. (Tr. 570-78). Dr. Nagel indicated Ms. Pate had been diagnosed with "whole spine degenerative arthritis" with increasing pain in recent years and "significant medically refractory back pain." (Tr. 570-71). Dr. Nagel indicated Ms. Pate would need a lumbar spine MRI for review and a thoracic spine MRI for operative planning; once those MRIs were completed, Ms. Pate would be scheduled for the implant. (Tr. 571).

Stephen Sutherland, M.D., a state agency medical consultant, reviewed Ms. Pate's record at the initial level on September 14, 2018. (Tr. 70-74). In his assessment, Ms. Pate could occasionally lift and/or carry twenty pounds occasionally and ten pounds frequently, with no other push/pull limitations. (Tr. 71). Ms. Pate could stand and/or walk for six hours and sit for six hours in an eight-hour workday. (*Id.*). Ms. Pate could frequently climb ramps/stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally kneel, crouch, and crawl; and should avoid exposure to unprotected heights. (Tr. 71-72). Ms. Pate was assessed as limited to light work due to her physical limitations. (Tr. 74).

13

Kalpna Desai, M.D., a state agency medical consultant, assessed Ms. Pate's record at the reconsideration level in October 2018. (Tr. 76). On reconsideration, Ms. Pate was assessed as able to lift and/or carry twenty pounds occasionally and ten pounds frequently, with no other push/pull limitations. (Tr. 81). Ms. Pate could stand and/or walk for six hours and sit for six hours in an eight-hour workday. (*Id.*). Ms. Pate could frequently climb ramps/stairs; never climb ladders, ropes, or scaffolds; had no limitations in balancing, kneeling, and crouching; she could occasionally crawl; and should avoid exposure to unprotected heights, heavy machinery, and commercial driving. (Tr. 81-83). Ms. Pate was assessed as limited to light work due to her physical limitation. (Tr. 85).

## THE ALJ'S DECISION

The ALJ's decision, dated September 4, 2019, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2020.

2. The claimant has not engaged in substantial gainful activity since December 31, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: disorders of the back (discogenic and degenerative), rheumatoid arthritis, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently, she can walk for four hours in an eight hour work day, she can stand for four in an eight hour work day, she can sit six hours in an eight hour work day, she would need a sit and stand option every half hour

for two minutes with no loss of productivity, she can constantly push, pull, and use foot pedals, she can frequently climb ramps and stairs, she can never climb ladders, ropes, and scaffolds, she can constantly balance, stoop, kneel, and crouch, she can occasionally crawl, she can constantly reach, handle, finger, and feel bilaterally, and she must avoid dangerous machinery and unprotected heights.

6. The claimant is capable of performing past relevant work as a Receptionist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2014, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 17-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the

court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Pate raises the following errors for the District Court's review:

I. Whether the ALJ erred when he found that Ms. Pate was capable of performing past relevant work as a receptionist when Ms. Pate's work as a receptionist did not arise to the level of substantial gainful activity; and,

II.     Whether the ALJ erred when he found that Ms. Pate was capable of performing a range of light work activity when the ALJ failed to fully and fairly evaluate the limitations resulting from Ms. Pate's severe impairments.

(Pl.'s Br., ECF #15, PageID 677-83). The Commissioner contends that ALJ's decision is supported by substantial evidence, and that any alleged error is harmless. (Comm'r's Br., ECF #17, PageID 701-09).

**I.     The ALJ's Step Four determination that Ms. Pate could perform past relevant work as a receptionist is harmless error.**

At Step Four, the ALJ determined Ms. Pate could perform past relevant work as a receptionist. (Tr. 27-28). Ms. Pate asserts this determination was erroneous because this work was performed on a part-time basis; as such, it does not meet the standard for substantial gainful activity under 20 C.F.R. § 404.1560(b)(1) and therefore does not qualify as past relevant work. (Pl.'s Br., ECF #15, PageID 677-79). The Commissioner responds by omitting the portion of the regulation requiring that past relevant work also be substantial gainful activity and casts Ms. Pate's argument as only "that she did not earn enough as a Receptionist." (Comm'r's Br., ECF #17, PageID 707). In this regard, the Commissioner's argument is not well-taken. However, remand on this basis alone is futile because the ALJ's Step Five determination meets the substantial evidence threshold, as I discuss in Part II below.

At Step Four, the ALJ "will consider [the claimant's] residual functional capacity together with [the claimant's] vocational background . . . ." 20 C.F.R. § 404.1560(a). The ALJ then compares the claimant's RFC assessment against "the physical and mental demands of [the claimant's] past relevant work." *Id.* at § 404.1560(b). "Past relevant work" is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." *Id.* at § 404.1560(b)(1).

Ms. Pate does not dispute that the receptionist position was done within the relevant 15-year time period; nor does she dispute that she performed the work long enough to learn it. (Pl.'s Br., ECF # 15, PageID 678). Rather, she contends her work as a receptionist did not rise to the level required to be considered substantial gainful activity and therefore did not meet the standard for past relevant work. (*Id.*).

When considering whether a claimant's past work is substantial gainful activity, the primary consideration is the income derived from the activity. 20 C.F.R. § 404.1574(a)(1). Earnings must exceed a minimum threshold to be considered substantial gainful activity, calculated on the basis of average monthly earnings. *Id.* at § 404.1574(b)(3). The Agency provides the following table calculating the monthly threshold earnings each year dating back to 1975:

**Monthly substantial gainful activity amounts by disability type**

| Year | Blind | Non-blind | Year | Blind | Non-blind | Year | Blind | Non-blind |
|------|-------|-----------|------|-------|-----------|------|-------|-----------|
| 1975 | $200 | $200 | 1995 | $940 | $500 | 2015 | $1,820 | $1,090 |
| 1976 | 230 | 230 | 1996 | 960 | 500 | 2016 | 1,820 | 1,130 |
| 1977 | 240 | 240 | 1997 | 1,000 | 500 | 2017 | 1,950 | 1,170 |
| 1978 | 334 | 260 | 1998 | 1,050 | 500 | 2018 | 1,970 | 1,180 |
| 1979 | 375 | 280 | 1999 | 1,110 | 700[a] | 2019 | 2,040 | 1,220 |
| 1980 | 417 | 300 | 2000 | 1,170 | 700 | 2020 | 2,110 | 1,260 |
| 1981 | 459 | 300 | 2001 | 1,240 | 740 | 2021 | 2,190 | 1,310 |
| 1982 | 500 | 300 | 2002 | 1,300 | 780 | 2022 | 2,260 | 1,350 |
| 1983 | 550 | 300 | 2003 | 1,330 | 800 | | | |
| 1984 | 580 | 300 | 2004 | 1,350 | 810 | | | |
| 1985 | 610 | 300 | 2005 | 1,380 | 830 | | | |
| 1986 | 650 | 300 | 2006 | 1,450 | 860 | | | |
| 1987 | 680 | 300 | 2007 | 1,500 | 900 | | | |
| 1988 | 700 | 300 | 2008 | 1,570 | 940 | | | |
| 1989 | 740 | 300 | 2009 | 1,640 | 980 | | | |
| 1990 | 780 | 500 | 2010 | 1,640 | 1,000 | | | |
| 1991 | 810 | 500 | 2011 | 1,640 | 1,000 | | | |
| 1992 | 850 | 500 | 2012 | 1,690 | 1,010 | | | |
| 1993 | 880 | 500 | 2013 | 1,740 | 1,040 | | | |
| 1994 | 930 | 500 | 2014 | 1,800 | 1,070 | | | |

19

*Social Security Administration*, *Substantial Gainful Activity*, http://www.ssa.gov/oact/cola/sga.html (last accessed January 7, 2022).

Part-time work may qualify as substantial gainful activity. *King v. Astrue*, No. 6:08-57-JMH, 2009 WL 301939, at *3 (E.D. Ky. Feb. 6, 2009) ("Certainly, part time work can, in some instances, be substantial gainful activity . . . ."); *see also* Program Operations Manual System ("POMS") DI 25005.015(F), at https://secure.ssa.gov/poms.nsf/lnx/0425005015 (last accessed January 7, 2022). POMS instructs that the substantial gainful activity calculation may be based on the number of months the claimant worked in a year (or an annualized basis if the claimant worked all twelve months), or the monthly basis may be calculated based on a claimant's reports of pay per hour and hours worked per week. POMS DI 25005.015(D)(1). An ALJ may rely on computer-generated earnings reports and the claimant's own testimony to establish whether past work was relevant. *See Roberts v. Colvin*, No. 1:14-CV-521, 2015 WL 5013771, at *3 (S.D. Ohio July 28, 2015), *report and recommendation adopted sub nom. Roberts v. Acting Comm'r of Soc. Sec.*, 2015 WL 5004669 (S.D. Ohio Aug. 24, 2015); *see also O'Neal v. Comm'r of Soc. Sec.*, No. 1:12-CV-246, 2013 WL 620377, at *10 (S.D. Ohio Feb. 19, 2013), *report and recommendation adopted*, 2013 WL 1438005 (S.D. Ohio Apr. 9, 2013). But where there is a conflict in the evidence, the ALJ must provide reasoning sufficient to permit this Court's meaningful review. *Roberts*, 2015 WL 5013771 at *4 ("the ALJ's failure to address Plaintiff's Earnings Statement and to provide a substantive basis for accepting or rejecting this evidence prevents the Court from engaging in meaningful review of the ALJ's decision").

At the hearing, Ms. Pate testified she worked as a receptionist on a part-time basis; her schedule was up to six-hour shifts, three days per week. (Tr. 52). Ms. Pate was paid $10 per hour for her work as a receptionist. (Tr. 57). By and large, Ms. Pate's reported earnings from her work as

a receptionist did not rise beyond the required monthly earnings to be considered substantial gainful activity:

| Year | Employer | Annual Earnings |
|------|----------|-----------------|
| 2011 | Shear Elegance | $689.28 |
| 2012 | Shear Elegance | $5,952.83 |
| 2013 | Shear Elegance | $5,562.00 |
| 2013 | Sun Dance Day Spa | $120.00 |
| 2014 | Sun Dance Day Spa | $6,012.50[4] |
| 2014 | Illusions Unlimited | $7,343.02 |

(Tr. 158-59).

In the decision, the ALJ states the VE relied on Ms. Pate's own "reports and testimony of her past work" to classify Ms. Pate's job as a receptionist, DOT #237.367-010. (Tr. 27). The ALJ then recites the regulations with no further discussion, finding it was past relevant work: "[a]s required by SSR 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period." (*Id.*). This recitation of the regulations—and citing to SSR 82-62—does not provide this Court with rationale sufficient to obtain a clear picture of Ms. Pate's case, as is required.

---

[4]     Without deciding, Ms. Pate's earnings in 2014 may exceed the requisite earnings threshold, if her income from Sun Dance Day Spa and Illusions Unlimited are added together. However, it is unclear how many months Ms. Pate worked in these positions, or if either could be considered an "unsuccessful work attempt" and thereby not be considered substantial gainful activity. *See* POMS DI 25005.015(D), at https://secure.ssa.gov/poms.nsf/lnx/0425005015 (last accessed January 7, 2022) *and*; POMS DI 11010.145, at https://secure.ssa.gov/poms.nsf/lnx/0411010145 (last accessed January 7, 2022).

As the Sixth Circuit instructs, "an ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes." *Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428 (6th Cir. 1999). This direction "is more than merely 'helpful' for the ALJ to articulate reasons . . . . It is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of Health & Hum. Servs.*, 753 F.2d 517, 519 (6th Cir. 1985), *quoting Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984). Further, the "rationale for a disability decision must be written so that a clear picture of the case can be obtained." SSR 82-62.

I disagree with the Commissioner's evaluation of this issue. The ALJ's perfunctory remarks finding Ms. Pate's part-time position as a receptionist was past relevant work does not afford this Court sufficient rationale to determine whether substantial evidence supports the ALJ's findings. Ms. Pate has presented sufficient evidence of a conflict in both the record earnings and her testimony at the hearing. The Commissioner has not pointed to contrary evidence; rather, the Commissioner's brief omitted necessary portions of the regulations describing substantial gainful activity and pointed to Ms. Pate's aggregated annual earnings including specialized positions Ms. Pate no longer had the RFC to perform. (Comm'r's Br., ECF #17, PageID 707-08; *see also* Tr. 28, 57-60). This failure to follow regulations and to provide sufficient rationale for this Court's review, without more, would lead me to recommend remand.

However, because the ALJ's RFC and resulting Step Five determination was supported by substantial evidence, any error is harmless, and remand would thus appear to be "an idle and useless formality." *See Hall v. Astrue*, No. 1:09 CV 2514, 2010 WL 5621291, at *14 (N.D. Ohio Dec. 23, 2010), *report and recommendation adopted sub nom. Hall v. Comm'r of Soc. Sec.*, 2011 WL 194615 (N.D. Ohio Jan. 20, 2011). I therefore decline to recommend remand on this basis.

22

II. **Substantial evidence supports the ALJ's evaluation of the evidence and determination that Ms. Pate could perform light work with additional restrictions.**

Ms. Pate next argues the ALJ did not adequately evaluate Ms. Pate's complaints of pain; she asserts that a finding of a sedentary RFC would have been appropriate if the ALJ had properly evaluated Ms. Pate's complaints under SSR 16-3p (and as bolstered by her treating physician's opinions). (Pl.'s Br., ECF #15, PageID 679-83). The Commissioner responds that the ALJ's RFC determination is supported by substantial evidence and is sufficiently explained, consistent with Agency regulations. (Comm'r's Br., ECF #17, PageID 700-07). I agree with the Commissioner that the ALJ's RFC determination of a light exertional level with additional restrictions is supported by substantial evidence.

A. **The ALJ explained the factors of supportability and consistency when forming the RFC.**

Ms. Pate's case is evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at § 404.1520c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL

23

1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[5] and consistency.[6] 20 C.F.R. at § 404.1520c(b). An ALJ must explain how the ALJ considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors. *Id.*; *see also id.* at § 404.1520c(b)(2).

The determination of an individual's RFC is an issue reserved for the Commissioner. 20 C.F.R. § 404.1527(d). Even so, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue,* No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). An ALJ may rely on the limitations contained in a medical opinion when forming the RFC, but is not required to adopt all opined limitations, even if the ALJ finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir. 2015). The ALJ may also impose restrictions beyond those set forth in a medical opinion; doing so does not mean an RFC is unsupported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015). Rather, the ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other

---

[5]   "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[6]   "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

factors regarding the claimant's functional limitations. *Avery*, 2020 WL 2496917, at *11. The ALJ

also must determine the "extent to which the symptoms can reasonably be accepted as consistent

with the objective medical and other evidence in the individual's record." *Id.*

Here, the ALJ provided the following RFC:

> After careful consideration of the entire record, I find the claimant has the residual
> functional capacity to perform light work as defined in 20 CFR 404.1567(b) except
> she can lift and carry 20 pounds occasionally and 10 pounds frequently, she can walk
> for four hours in an eight hour work day, she can stand for four in an eight hour
> work day, she can sit six hours in an eight hour work day, she would need a sit and
> stand option every half hour for two minutes with no loss of productivity, she can
> constantly push, pull, and use foot pedals, she can frequently climb ramps and stairs,
> she can never climb ladders, ropes, and scaffolds, she can constantly balance, stoop,
> kneel, and crouch, she can occasionally crawl, she can constantly reach, handle,
> finger, and feel bilaterally, and she must avoid dangerous machinery and unprotected
> heights.

(Tr. 18-19). The ALJ provided a thorough review of Ms. Pate's severe impairments, including her

back disorders (and resulting pain), RA, and obesity, beginning with a spinal MRI from 2013

showing her back disorders, and continuing through treatment in the months prior to the 2019

hearing date. (Tr. 19-25). The ALJ compared the treatments Ms. Pate received against other clinical

findings showing normal results. (Tr. 24-25).

The ALJ further compared and contrasted the medical opinions in the record: State

Agency physicians Dr. Sutherland (initial level) and Dr. Desai (reconsideration), Consultative

Physical Examiner Dr. Mahmood, and Ms. Pate's treating physician, Dr. Penciu. (Tr. 25-26). The

ALJ stated:

> State Agency physicians, Stephen Sutherland, M.D., and Kalpna Desai, M.D., felt
> that the claimant's severe physical impairments warranted functional limitations.
> They believed the claimant was capable of performing work at the light exertional
> level with additional postural and environmental limitations . . . Dr. Desai noted that
> she modified the residual functional capacity from the initial level based on the
> consultative physical examination report. I find the reconsideration level opinion
> more persuasive than the initial level opinion. . . . I find that the opinions are mostly

consistent with the opinion of the Consultative Physical Examiner, Dr. Mahmood, but are not consistent with the opinion of the claimant's provider, Dr. Penciu, or with the claimant's testimony of her alleged level of limitation.

(*Id.*) (internal citations omitted). The ALJ further explained the inconsistencies by stating,

> [Ms. Pate's] alleged level of limitation is not supported by the clinical findings from the consultative examination discussed above or with other clinical findings includ[ing] normal motor skills, normal or intact sensation, normal reflexes, normal strength, no cranial nerve deficit, normal straight leg raise testing, a normal gait, 2+/4 deep tendon reflexes, normal musculoskeletal and neck range of motion, strong and symmetric upper extremities, no clonus of the bilateral lower extremities, normal stability, coordination, muscle strength, and muscle tone, a negative slump test, positive vibratory sensation in her bilateral upper and lower extremities, no abnormal curvature of her back, normal arm swing with no drift present, and no distress.

(Tr. 26). The ALJ then provided two paragraphs more fully explaining his reasoning regarding the opinions of Dr. Mahmood and Dr. Penciu. (Tr. 27). Ultimately, the ALJ stated that he considered the signs and symptoms of Ms. Pate's impairments and that he found Ms. Pate able to perform within the restrictions outlined in the RFC. (*Id.*).

The ALJ's explanation of the medical opinions meets the regulation requirements to explain the supportability and consistency factors. I find no basis to disturb the ALJ's decision in this regard.

## B. The ALJ appropriately considered Ms. Pate's subjective symptoms of pain.

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Then, the Commissioner evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the

second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id.*

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," as long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Here, The ALJ began his analysis with the following statement:

[Ms. Pate] experienced lower back, neck, and shoulder pain, joint pain and stiffness that made it difficult to stand, walk, sit, lift, bend, and reach. She testified that she must changes [*sic*] positions frequently as it was hard for her to sit and stand for long periods. [Ms. Pate] felt she could lift less than 10 pounds, stand doing housework for 10 to 15 minutes, and sit 20 to 25 minutes before needing to change positions. She explained that she had good and bad days and with a bad day, she struggled with

27

> getting out of bed, sitting in a chair, and walking. She testified that she could raise both arms overhead.

(Tr. 19). The ALJ then reviewed Ms. Pate's treatment records, and included observations of Ms. Pate's condition and symptoms in his analysis, as follows:

- "the claimant appeared distressed. She had tenderness and hypertonicity of the lumbar spine and decreased range of motion of the lumbar spine" (Tr. 20);

- "she had musculoskeletal tenderness. However, she was in no distress." (Tr. 21);

- "She reported she was disabled due to joint pain that was exacerbated by standing, walking, bending, and lifting and improved with heat therapy. Upon examination, the claimant exhibited tenderness of the right knee and lower back." (Tr. 22);

- "The claimant reported that her medication improved her ability to perform her activities of daily living and she testified that she was able to drive short distances, complete household chores with breaks, visit her mother, and go shopping as physical[ly] able." (Tr. 25).

After review, the ALJ concluded, "functional limitations are warranted" and provided additional limitations in the RFC "to avoid exacerbating [Ms. Pate's] disorders of the back (discogenic and degenerative) and rheumatoid arthritis and to account for [Ms. Pate's] likely mobility issues secondary to obesity as well as her subjective complaints . . . ." (Tr. 25).

Ms. Pate points to evidence in the record supporting the severity of her complaints, and asserts this demonstrates her need for a sedentary RFC. (Pl.'s Br., ECF #15, PageID 680-82). However, the ALJ acknowledged such evidence when forming the RFC. I therefore find no basis to disturb the ALJ's analysis of Ms. Pate's subjective complaints.

### C.    Substantial evidence supports a light RFC with additional restrictions.

Ms. Pate argues she should have been limited specifically to a sedentary RFC—notably, an issue dispositive to her finding of disability. (Pl's Br., ECF #15, PageID 679-83; *see also* Grid Rule

201.14). The ALJ did not choose to do so here; rather, the ALJ crafted an RFC at the light

exertional level, with additional limitations that border on sedentary:

> I find the claimant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) except she can lift and carry 20 pounds occasionally
> and 10 pounds frequently, she can walk for four hours in an eight hour work day,
> she can stand for four in an eight hour work day, she can sit six hours in an eight
> hour work day, she would need a sit and stand option every half hour for two minutes
> with no loss of productivity, she can constantly push, pull, and use foot pedals, she
> can frequently climb ramps and stairs, she can never climb ladders, ropes, and
> scaffolds, she can constantly balance, stoop, kneel, and crouch, she can occasionally
> crawl, she can constantly reach, handle, finger, and feel bilaterally, and she must
> avoid dangerous machinery and unprotected heights.

(Tr. 18-19). Ms. Pate attacks this RFC as inconsistent with the evidence, stating generally "[t]he

record does not support a finding that Ms. Pate is capable of performing the requirements of light

work activity. Ms. Pate should have been evaluated based upon a residual functional capacity for

sedentary work." (Pl.'s Br., ECF #15, PageID 683).

While the ALJ generally found Ms. Pate capable of performing at a light RFC, the ALJ also

included a number of additional restrictions to accommodate Ms. Pate's physical impairments,

namely, limiting her to four hours standing and walking, six hours of sitting, a sit/stand option

every half-hour, and a number of other postural limitations. (Tr. 18-19). I note that some of these

limitations border on agency guidelines for a sedentary RFC. *See* SSR 83-10 (describing the

requirements of various exertional levels, including comparisons between gross and fine

manipulative abilities, stand/walk requirements for sedentary work, "periods of standing or

walking should generally total no more than about 2 hours of an 8-hour workday, and sitting

should generally total approximately 6 hours of an 8-hour workday," and light jobs that can be

performed while seated, "A job is [in the light exertional] category when it involves sitting most of

the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work.").

At least one court within the Sixth Circuit has found it against Agency policy for an ALJ to include sedentary stand/walk limitations in a light RFC, rather than finding the claimant capable of a sedentary RFC. *See Wilkerson v. Comm'r of Soc. Sec.*, 278 F. Supp. 3d 956, 960 (E.D. Mich. 2017) (finding that a limit of two hours standing/walking per day was not appropriately included in a light work RFC). At the same time, however, courts in this judicial district have held otherwise. *See Barron-Green v. Comm'r of Soc. Sec.*, No. 1:18 CV 1705, 2019 WL 4194142, at *7 (N.D. Ohio Sept. 4, 2019) (distinguishing *Wilkerson* against prevailing Sixth Circuit case law and cases in this Court). An ALJ may craft a modified RFC limiting a claimant to light work with additional restrictions, including, as here, a limitation of standing or walking for four hours in an eight-hour workday. *Id.* at *6-*7; *see also Icke v. Comm'r of Soc. Sec.*, No. 1:16-CV-01208, 2017 WL 2426246, at *5 (N.D. Ohio May 16, 2017), *report and recommendation adopted*, 2017 WL 2418729 (N.D. Ohio June 2, 2017).

Ultimately, the ALJ in this case crafted a light RFC that included sedentary limitations. (Tr. 18-19). The ALJ posed this RFC in the form of a hypothetical to the VE, and the VE identified jobs in the national economy that fit within the RFC the ALJ created. (*Compare* Tr. 18-19 *with* Tr. 58-60). An ALJ may rely on the VE's testimony as substantial evidence to support findings at Step Five. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).

Ms. Pate argues she should be limited to a sedentary RFC, but has not sufficiently shown that the restrictions included in the RFC are inconsistent with her abilities or that they were unconsidered by the ALJ. This Court must defer to the Commissioner's decision if supported by

substantial evidence, even if there is evidence in the record that may support an opposite conclusion. *Jones*, 336 F.3d at 477. Therefore, I recommend the District Court affirm the Commissioner as to this issue.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disability insurance benefits supported by substantial evidence. I therefore recommend the District Court **AFFIRM** the Commissioner's decision.

Dated: January 10, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). **Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). **Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509).

The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).